IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CR3024 |
| | ) | |
| v. | ) | |
| | ) | |
| HECTOR RODRIGUEZ JR., LUIS | ) | REPORT AND RECOMMENDATION |
| ALFONSO RUIZ, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The defendants have filed motions to suppress all evidence obtained as a result of their detention and the subsequent search of the vehicle they occupied on January 13, 2008. Filings 24 & 27. The defendants claim they were illegally detained by Seward County Deputy Sheriff Randy Brown, and the vehicle they occupied was unlawfully searched without a warrant, probable cause, or the defendants' consent. For the reasons discussed below, the defendants' motions to suppress should be granted.

FACTUAL FINDINGS

An evidentiary hearing was held on April 21, 2008. See filings 36 (audio file), and 40 (transcript). Based on the evidence presented at the hearing, I find the credible facts to be as follows:

Deputy Sheriff Brown, a canine officer for the Seward County Sheriff's Department, has been employed as an officer for that agency for approximately six years. He has received basic law enforcement training and additional training in drug identification and interdiction, including instruction on the methods used to package, conceal, and transport illegal

contraband.  Deputy Sheriff Brown and his canine, Alec, are certified canine officers for illegal drug detection.

While performing his patrol duties on January 13, 2008, Deputy Sheriff Brown observed an eastbound 1999 Toyota Camry following a semi-trailer truck on Interstate 80 near mile marker 386.  Deputy Sherif Brown was traveling in the left eastbound lane of Interstate 80; the Toyota Camry was in the right eastbound lane.  From his position in the left lane, Deputy Sheriff Brown observed that the Toyota Camry was following less than one car length behind the semi-trailer truck.  This distance is insufficient for vehicle drivers to see and perceive the need to stop, and to actually stop their vehicle before colliding with the vehicle they are following.

The Toyota Camry moved to the left lane.  Deputy Sheriff Brown activated his overhead lights to initiate a traffic stop for following too close in violation of Neb. Rev. Stat. § 60-6,140.  The officer noticed the driver of the Toyota Camry, later identified as defendant Rodriguez, reach his arm toward the passenger area.  A passenger, later identified as defendant Ruiz, sat up and was then visible in the passenger seat.

Rodriguez promptly drove the Toyota Camry to the shoulder of the interstate and stopped.  The officer's in-car camera was activated and depicts the events and communications occurring during the traffic stop, canine sniff, and subsequent search.[1]

---

[1]The officer's in-car camera equipment produced a VHS tape. The government transferred the content of the VHS tape to DVDs that were provided to the court and defendants' counsel prior to the suppression hearing.  Due to the court's inability to view the DVD prior to the hearing, both the DVD, (ex. 1), and the underlying videotape, (ex. 2), were offered by the government and

2

Deputy Sheriff Brown exited his vehicle and approached the passenger side of the Camry.  The officer asked for Rodriguez' driver's license, and for the vehicle registration and proof of insurance.  While standing beside the car, he observed that both defendants were trembling.  He also saw about a dozen whole, uncut, oranges on the passenger floorboard and in the backseat area behind driver's seat.  Based on his training and experience, the officer knew citrus fruits are sometimes used as natural air fresheners to mask the odor of illegal drugs during transport.

Deputy Sheriff Brown asked Rodriguez to exit the vehicle and be seated in the patrol vehicle.  Rodriguez did not immediately comply.  Instead, he stayed in the car for a very brief period of time speaking with Ruiz until the officer again approached the Camry to check on the delay.  Rodriguez then exited the Camry and was seated in the passenger front seat in the patrol vehicle.

Alec, the canine, was located in the back of the officer's patrol vehicle and was very agitated during the entire traffic stop.  While inside the patrol vehicle with defendant Rodriguez, Alec barked nearly constantly, and stopped only in response to the officer's repeated shouts of "Alec," "Nein," "Shut up," or "Sit."

Deputy Sheriff Brown reviewed Rodriguez' driver's license, contacted dispatch, and asked for criminal history information on Rodriguez.  While awaiting a response, the officer explained that Rodriguez was stopped for following too close, and he would be

---

received into evidence during the hearing.  Both were reviewed, and the events reflected on the videotape and DVD are the same. However, the DVD recording is of much higher quality.

3

issued a warning ticket.  The officer questioned Rodriguez about
the origin, destination, and purpose of the defendants' trip.

Rodriguez spoke "a little" English, but did not have
noticeable difficulty communicating with the officer.  In
response to the officer's questions, Rodriguez stated he was
coming from Denver, was heading to Lincoln, and was transporting
Ruiz (identified during the traffic stop as "Valencia") to
Lincoln to visit Ruiz' family for two or three days.  Rodriguez
stated Ruiz was his cousin, and the vehicle belonged to Ruiz'
wife.

Approximately seven minutes after the stop was initiated,
dispatch reported a "possible III" on Rodriguez, meaning that
based on the information provided by the officer, Rodriguez may
have a criminal history, but Rodriguez' date of birth did not
match the criminal history data retrieved by the dispatcher.
Deputy Sheriff Brown repeated Rodriguez' date of birth to the
dispatcher and asked her to repeat the criminal history check.

The officer then exited his vehicle to contact Ruiz.  A
significant communication barrier existed during this
conversation.  The officer needed to repeat his questions to get
any response, and in the course of doing so, reworded several
questions so that only a "yes" or "no" response was required.  To
the extent Ruiz provided any response at all other than a "yes"
or "no," Ruiz stated the car was owned by his girlfriend, Marisol
Andrade, the defendants were traveling from Denver to Indiana,
they may be stopping in Lincoln, and he was hungry.  Ex. 1, at
10:00-12:30.  The vehicle registration confirmed that the car was
owned by Marisol Andrade.

Deputy Sheriff Brown returned to his patrol vehicle and again questioned Rodriguez concerning the trip itinerary and purpose.  Rodriguez repeated that the defendants were going to Lincoln to visit Ruiz' family for two or three days.  He stated he was returning to Denver, believed Ruiz would be returning with him, and he and Ruiz were not planning to travel anywhere else. He further stated Ruiz was not traveling to Indiana.

Dispatch reported there was no criminal history for a person with Rodriguez' name and date of birth.  The officer asked for additional information regarding tattoos or scars to confirm Rodriguez was not the subject of the "possible III" initially reported.  Dispatch reported the location of these body markings. Based on this information, the officer checked Rodriguez' wrists and decided Rodriguez did not have a criminal history.

The officer briefly re-asked Rodriguez about the defendants' trip itinerary and purpose, and approximately one minute after confirming that the "possible III" was not related to Rodriguez, gave Rodriguez a warning ticket and returned his licence and vehicle registration and proof of insurance.  Ex. 1, 15:00-16:27. Approximately seventeen minutes had passed since the traffic stop was initiated.

The officer immediately gave Rodriguez a Spanish consent-to-search form and asked him if he could read Spanish.  He did not advise Rodriguez that he was free to leave or that the traffic stop was complete.  Rodriguez began reading the consent to search form, and stated he was not the vehicle owner and the officer would need to speak with Ruiz.  The officer explained that since neither vehicle occupant owned the vehicle, as the driver,

Rodriguez could consent to the search.  Rodriguez did not consent
to a search of the vehicle.   Ex. 1, 16:30-18:00.

    Deputy Sheriff Brown stated Rodriguez needed to stay seated
because the officer was going to run his dog around the car.  Ex.
1, 17:50-18:00.  Rodriguez did not respond.

    The officer called for backup assistance, preferably from
the Nebraska State Patrol since a patrol officer was likely
closer to the location of the stop.  He exited his patrol vehicle
to speak to Ruiz.  He asked Ruiz if there were drugs, cocaine, or
heroin in the vehicle.  Ruiz responded "no" or "nothing" to each
of these questions.  The officer asked Ruiz to put on his shoes
and coat.

    While Ruiz was putting on his shoes, Deputy Sheriff Brown
returned to his patrol vehicle and had Rodriguez exit the
vehicle.  The officer confirmed that Rodriguez had no weapons and
told him to stand by the fence line located about 25 yards from
the shoulder of the interstate.

    The deputy returned to the Camry and directed Ruiz out of
the car.  Ruiz went to the driver's side door to open the trunk
from the inside, and then walked to the rear of the car and
opened the trunk to retrieve his coat.  Ruiz did not close the
trunk lid.  The deputy questioned and pat searched Ruiz to
confirm that Ruiz had no weapons.  Ruiz was asked to stand by
Rodriguez.

    Deputy Sheriff Brown then returned to his vehicle and waited
approximately ten minutes for the arrival of backup assistance.
When a trooper arrived, the defendants were asked to lay their

cell phones on the hood of the trooper's vehicle.  The trooper monitored the defendants, one of whom was seated in the trooper's vehicle, until the canine sniff and vehicle search were complete.

Deputy Sheriff Brown deployed his canine approximately thirty-five minutes after the traffic stop was initiated, and approximately seventeen minutes after the traffic stop was complete.  Ex. 1, 34:30.

Alec was deployed to perform a canine sniff counterclockwise around the Camry starting at the front passenger side.  As Alec circled the vehicle, he jumped into the trunk, sniffed toward the back seat, and leaped out to continue circling around the vehicle.  He made a second circle around the vehicle, this time jumping up to place his paws on the back bumper near the trunk, returning to the roadway, and then doubling back to again look toward the back and underside of the vehicle's trunk until directed away from that location by Deputy Sheriff Brown.  When Alec circled the vehicle a third time, he briefly jumped onto the rear bumper and returned to the road.  The officer circled Alec back to the driver's side corner of the rear bumper, and patted that corner.  Alec jumped into the trunk, sniffed toward the backseat, and jumped out.  Ex. 1, 35:00-36:30.

On the videotape, Deputy Sheriff Brown told the trooper that Alec had "indicated" to the odor of drugs, explaining that when Alec circled the vehicle the first time, he had a "little head jerk on the bottom," and the second time he had a "full head jerk and started going underneath the car" until the deputy had stopped him.  While Alec's movements can be seen on the videotape, absent some explanation by testimony from the officer, Alec appears to be sniffing around and exploring like a typical

7

active and curious dog.  At most, Alec appeared "interested" in the trunk area.

During the evidentiary hearing, Deputy Sheriff Brown testified that Alec's act of jumping in the trunk was "significant," and the vehicle was searched based on the "significant behavior changes" the officer observed.  Filing 40, pp. 19-20.  Deputy Sheriff Brown was never asked, and he provided no testimony explaining why he believed Alec's conduct was "significant," or what specific behavior changes conveyed that message.  There was no testimony explaining whether Alec was trained to jump into a vehicle trunk and sniff around if the opportunity presented itself, or whether Alec's interest in the trunk was prompted by the smell of illegal drugs rather than by, for example, the smell of oranges.  The officer was not asked and he did not testify that Alec "alerted" or "indicated" to the presence of the odor of illegal drugs.

LEGAL ANALYSIS

Ruiz challenges the traffic stop, claiming Deputy Sheriff Brown lacked probable cause to initiate the stop.  Both defendants claim they were unlawfully detained, and that the officer lacked probable cause to search the Toyota Camry.

A.   The Traffic Stop.

"A traffic stop constitutes a seizure under the Fourth Amendment. . . .  An officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop comports with the Fourth Amendment."  U.S. v. Peralez, 2008 WL 2038805, 3 (8th Cir. May 14, 2008) (citing Delaware v. Prouse,

440 U.S. 648, 653 (1979), and Pennsylvania v. Mimms, 434 U.S.
106, 109 (1977)).  "[I]t is well established that a traffic
violation--however minor--creates probable cause to stop the
driver of a vehicle."  U.S. v. Lyons, 486 F.3d 367, 371 (8th Cir.
2007).  See also, U.S. v. Wright, 512 F.3d 466, 471 (8th Cir.
2008); U.S. v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); U.S. v.
Herrera-Martinez, 354 F.3d 932, 934 (8th Cir. 2004); U.S. v.
Linkous, 285 F.3d 716, 719 (8th Cir. 2002); U.S. v. Alcantar, 271
F.3d 731, 736 (8th Cir. 2001).

    "Courts are not to consider the motive for a stop as long as
the reason for the stop is valid."  U.S. v. Jones, 275 F.3d 673,
680 (8th Cir. 2001).  "An otherwise constitutional traffic stop
is not invalidated by the fact that it was 'mere pretext for a
narcotics search.'"  Wright, 512 F.3d at 471 (8th Cir.
2008)(quoting U.S. v. Williams, 429 F.3d 767, 771 (8th Cir.
2005)).  "[S]o long as the officer is doing nothing more than he
is legally permitted and objectively authorized to do, his actual
state of mind is irrelevant for purposes of determining the
lawfulness of the stop."  Alcantar, 271 F.3d at 736.

    Nebraska law provides:

        The driver of a motor vehicle shall not follow another
        vehicle more closely than is reasonable and prudent,
        and such driver shall have due regard for the speed of
        such vehicles and the traffic upon and the condition of
        the roadway.

Neb. Rev. Stat. § 60-6,140(1).  A trooper's observation that a
vehicle is following another too closely provides probable cause
for a traffic stop.  U.S. v. Lyton, 161 F.3d 1168, 1170 (8th Cir.
1998)(interpreting Nebraska law).  See also U.S. v. Beck, 140
F.3d 1129, 1134 (8th Cir. 1998) (holding officer who observed

defendant following a motor vehicle too closely had probable cause to initiate a traffic stop).

Deputy Sheriff Brown observed the Camry occupied by the defendants following less than a car length behind a semi tractor-trailer.  Although Ruiz claims a semi tractor-trailer cannot stop quickly, and therefore vehicles can follow semis more closely and still stop in time to avoid a collision, irrespective of the type of vehicle involved, following less than one car length behind another vehicle traveling at interstate speeds is "more closely than is reasonable and prudent."  Neb. Rev. Stat. § 60-6,140(1).  Deputy Sheriff Brown had probable cause to believe that Rodriguez had violated Nebraska law by following another vehicle at an unreasonably close distance.  The traffic stop of defendants' vehicle did not violate the Fourth Amendment.

B.    Unlawful Detention Prior to Search.

"A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose."  Peralez, 2008 WL 2038805, at *3(quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

> During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.  The tasks include asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose.  An officer may ask passengers these questions.  If complications arise during these routine tasks, the vehicle may reasonably be detained for a longer duration than when a stop is strictly routine.  Whether a traffic stop is reasonable in length is a fact intensive question, and there is no per se time limit on all traffic stops.

Peralez, 2008 WL 2038805, at *3(internal citations and quotations omitted).

Deputy Sheriff Brown detained the defendants for approximately seventeen minutes to complete the traffic stop itself and issue a warning ticket.  During that time, he was checking, and for justifiable reasons, re-checking to confirm Rodriguez' criminal history and that he was not the subject of a warrant.  The officer did not ask questions beyond the scope of identifying the vehicle occupants, determining who owned the vehicle, and obtaining information about the defendants' trip.  The traffic stop itself was not prolonged by the officer or the parameters of his questioning.  U.S. v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)(holding that the officer did not unreasonably seize the defendant simply by asking three brief questions related to possible drug trafficking amidst his other traffic-related inquiries and tasks where the additional questions prolonged the stop only 25 seconds).  Compare Peralez, 2008 WL 2038805 (holding the defendant was unlawfully detained where the traffic stop was delayed because of the trooper interspersed drug interdiction questions throughout the routine processing of a traffic stop).

After the traffic stop was complete, Deputy Sheriff Brown asked Rodriguez for consent to search.  Rodriguez remained in the officer's vehicle for one and one-half minutes while he read the consent form, stated any consent should be provided by Ruiz, listened as the officer explained that a driver can consent, and ultimately refused consent to search.  Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask for identification, and request consent to search provided they do not convey the message

11

that the individual must comply with their requests.  Florida v. Bostick, 501 U.S. 429, 434 (1991).  The proper inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.  U.S. v. Drayton, 536 U.S. 194, 202 (2002).  The reasonable person test is objective and is based upon whether an innocent person in the position of the defendant would have felt compelled to speak with the officer, answer his questions, and cooperate with his requests.  Drayton, 536 U.S. at 202.

The court determines whether an encounter constitutes an unlawful detention or seizure on a case-by-case basis.  There is no litmus test distinguishing a consensual encounter from a seizure, and the test, such as it is, is "necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation."  Michigan v. Chesternut, 486 U.S. 567, 573 (1988).  "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."  Chesternut, 486 U.S. at 573.  An officer can, but need not advise a defendant that he can refuse to cooperate, and the fact that the officer is in uniform and armed carries little weight in determining if an encounter with law enforcement is consensual.  Drayton, 536 U.S. at 204, 207.

Deputy Sheriff Brown did not advise Rodriguez that he was free to leave following the traffic stop and before presenting him with the consent to search form.  However, the officer did not demand that Rodriguez remain seated in the patrol vehicle, and he did not order Rodriguez to sign the consent form, or even

12

to read it.  Deputy Sheriff Brown made no threats or promises to
induce Rodriguez to remain in the officer's vehicle while the
officer determined if Rodriguez would consent to a search.
Ultimately, Rodriguez did not sign the consent form, which
clearly indicates he did not feel compelled to accede to the
officer's requests.  Rodriguez was not unlawfully detained
following the stop and during the time period Deputy Sheriff
Brown was requesting, and Rodriguez was refusing, consent to
search.

After Rodriguez refused consent, Deputy Sheriff Brown
advised Rodriguez that he would be held while a canine sniff was
conducted.  Even in the absence of reasonable suspicion of
criminal activity, "dog sniffs that occur within a short time
following the completion of a traffic stop are not
constitutionally prohibited if they constitute only de minimis
intrusions on the defendant's Fourth Amendment rights." U.S. v.
Alexander, 448 F.3d 1014, 1016 (8th Cir. 2006)(citing Illinois v.
Caballes, 543 U.S. 405, 407 (2005).  "[W]hen a police officer
makes a traffic stop and has at his immediate disposal the canine
resources to employ this uniquely limited investigative
procedure, it does not violate the Fourth Amendment to require
that the offending motorist's detention be momentarily extended
for a canine sniff of the vehicle's exterior." U.S. v.
$404,905.00 in U.S. Currency, 182 F.3d 643, 649 (8th Cir.
1999)(holding a two-minute delay to conduct a canine sniff is a
de minimis intrusion on the driver's personal liberty).
Detaining a motorist for four minutes following a traffic stop in
order to perform a canine sniff is a de minimis intrusion and
does not justify suppression of evidence under the Fourth
Amendment. Alexander, 448 F.3d at 1016 (holding that even in the

absence of reasonable suspicion, a four-minute detention between
the conclusion of a traffic stop and a drug dog's alert was a de
minimis detention that did not violate the Fourth Amendment).

Deputy Sheriff Brown detained Rodriguez and Ruiz for
approximately seventeen minutes following the traffic stop before
deploying Alec to perform a canine sniff.  The deployment was
delayed awaiting a backup officer, and the court does not
question that officer safety concerns justified this course of
action.  However, even if the delay was warranted, it was
nonetheless a detention that extended well beyond a momentary
intrusion on Rodriguez' and Ruiz' personal liberty.  The
defendants' detention while awaiting a canine sniff cannot be
considered de minimis and therefore constitutionally permissible.

However, if an officer develops reasonable suspicion that
other criminal activity is afoot, the officer may detain the
vehicle for a reasonable length of time to perform a dog sniff.
U.S. v. Morgan, 270 F.3d 625, 631 (8th Cir. 2001).  When
reasonable suspicion exists, the motorist can be detained well
beyond a de minimis time frame.  See e.g., U.S. v. Lebrun, 261
F.3d 731, 734 (8th Cir. 2001)(waiting twenty minutes for drug dog
not unreasonable); United States v. White, 42 F.3d 457, 460 (8th
Cir. 1994)(finding delay of one hour and twenty minutes for
arrival of drug dog reasonable).  The court considers "the
totality of the circumstances, in light of the officer's
experience" when determining if reasonable suspicion existed.
Morgan, 270 F.3d at 631.  "[F]actors consistent with innocent
travel can, when taken together, give rise to reasonable
suspicion."  U.S. v. Beck, 140 F.3d 1129, 1137 (8th Cir.
1998)(citing U.S. v. Sokolow, 490 U.S. 1, 10 (1989)).  For
example, a driver's extreme nervousness, the presence of masking

14

odors, contradictory statements, distinctive or non-credible travel plans, and the divergence in stories provided by the driver and passenger may each be subject to an innocent explanation, but when considered in the totality, can warrant a finding of reasonable suspicion.  Morgan, 270 F.3d at 631.

Conflicting stories provided by a driver and passenger may justify expanding the scope of a traffic stop and the detention of the vehicle occupants.  U.S. v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004).  The defendants argue that a reasonable officer in Deputy Sheriff Brown's position would have recognized he could not effectively communicate with Ruiz, and would not have concluded that Rodriguez and Ruiz' stories conflicted.  I agree.

The language barrier in this case was much more significant and impeding than the vast majority of cases heard by the undersigned involving such barriers.  The videotape establishes that both the deputy and Ruiz struggled to understand what the other was saying, but it also demonstrates that they could not accurately nor effectively communicate due to the language barrier.  Ruiz' responses were not consistently appropriate for the question asked.  For example, when asked for the identity of the vehicle owner, after repeated questions and re-phrasing, during which the deputy several times asked Ruis another leading question before allowing him to respond to the pending one, (see ex. 1 at 10:15 - 11:10, ("Louise?" "Lisa?" "Angela?")), Ruiz eventually responded that the owner was Marisol Andrade.  From the videotape, it appears even then that the deputy had the names reversed.  Ex. 1 at 11:10.  Many questions were re-phrased to elicit "yes" or "no" answers.  Although the officer was successful in obtaining responses through this method of questioning, there was no evidence adduced during the hearing to

the effect that Ruiz understood Deputy Brown's questions, nor why
it was reasonable for Brown to believe that he did; there simply
was no objective basis on which a reasonable officer could
conclude that defendant Ruiz understood his questions before
providing his affirmative or negative responses.[2]  Considering

---

[2]Only one of the exchanges in the conversation would perhaps
support an inference by Brown that Ruiz even slightly understood
what he was being asked:

> Brown:  Where are you going?. . .  Are you goin' to Chicago?
> Ruiz: No.  Indiana.
> B:  You going to Indiana?  Indiana?
> R:  Yeah. . . . (inaudible)
> B:  OK.  You're coming from Denver going to Indiana?  OK.
> For how long?  You going to Indiana?  Indiana?
> R:  Yeah . . . . (inaudible)
> B:  Are you going to anywhere el--, Omaha?
> R:  (inaudible)
> B:  Lincoln?
> R:  Uh. . . stop (inaudible)
> B:  You're gonna stop at Lincoln?
> R:  Yeah . . . (inaudible) . . . highway . . . (inaudible).
> B:  For what?
> R:  . . . I'm hungry and . . . (inaudible) comer [Spanish
> for "to eat."]
> B:  Are you gonna eat?
> R:  I dunno. . . . (inaudible)
> B:  Yeah, ya do.  You're gonna eat?  Are you gonna eat in
> Lincoln?  Are you gonna visit?  Are you gonna visit?
> Family?  Family?
> R:  I dunno, prob'ly –
> B:  (interrupting) Uhhh.  Compadre?
> R:  Nah.
> B:  Compadre?  In Lincoln?
> R:  Nah--
> B:  Does he have compadres in Lincoln?
> R:  (inaudible)
> B:  Uh-hun.  No compadres?
> R:  (no audible response)

Ex. 1, 11:14 - 12:31.  (Ellipses mean there was something said
that was audible but not decipherable; "inaudible" means there
was something said but it was too faint to have any confidence
that it was even English being spoken, or that whatever was

the conversation in the context of being rapidly peppered with
compound questions by a law enforcement officer in a language
different from one's own, however, a reasonable officer in Deputy
Sheriff Brown's position would not have considered, much less
relied on, Ruiz' responses in determining whether his explanation
of the trip's purpose and itinerary differed from that provided
by Rodriguez.

Rodriguez' and Ruiz' alleged conflicting stories aside,
during the course of the traffic stop, Deputy Sheriff Brown
determined: 1) Rodriguez had no criminal history, with no such
information requested for Ruiz; 2) Rodriguez identified the
vehicle owner as Ruiz' wife, while Ruiz stated the vehicle owner
was his girlfriend and identified her by the name shown on the
vehicle registration; 3) there were uncut oranges on the vehicle
floor, and Brown believed citrus fruits can be used to mask the
odor of illegal drugs; and 4) on initial contact with the
officer, both Rodriguez and Ruiz appeared very nervous and
shaking.[3]  The totality of these facts do not establish
reasonable suspicion of criminal activity.  Beck, 140 F.3d at
1137) (finding no reasonable suspicion where the driver appeared
nervous and the story of his trip seemed implausible; the vehicle

---

spoken was drowned out by the noise of a passing vehicle).  This
is the closest that Ruiz came to being "responsive" to Brown's
questioning.  In the context of the entirety of the conversation
and the circumstances, however, this exchange is simply too vague
to reasonably support a conclusion that Ruiz understood anything
other than the most rudimentary English.  Rather, it appears only
coincidence that some of his answers tracked with the deputy's
questions.

[3]Although Rodriguez' counsel argues it is likely Alec's
persistent barking, rather than nervousness, caused Rodriguez to
tremble, Rodriguez and Ruiz both appeared nervous even before
Rodriguez was placed in the officer's vehicle.

was rented by an absent third party and licenced in California; there was fast food trash on the floor and no visible luggage; and the defendant was traveling from a drug source state to a drug demand state).

In the absence of reasonable suspicion, the prolonged detention of the defendants to perform a canine sniff following completion of the traffic stop was an unlawful seizure in violation of the Fourth Amendment.  The vehicle search was a direct result of the unlawful detention.  There were no attenuating circumstances, such as a delay in time between the detention and the search or an intervening consent to search, sufficient to purge the taint of this unlawful detention.  The defendants' motion to suppress should be granted.

    C.   <u>Illegal Search</u>.

Even if reasonable suspicion existed justifying the defendants' detention following the stop, for the following reasons, I conclude the vehicle search, and the defendants' detention while the search was conducted, violated the defendants' Fourth Amendment rights.

The defendants argue Deputy Sheriff Brown lacked probable cause to search the vehicle they occupied.  Rodriguez had denied consent to search; Ruiz was not asked to consent to a search. Deputy Sheriff Brown did not have a warrant to search the vehicle.

Deputy Sheriff Brown's act of deploying his canine to sniff the defendants' vehicle was not an unlawful vehicle search.  A dog sniff of the exterior of a vehicle is not a search under the

18

Fourth Amendment. City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000). The fact that Alec jumped into the Camry's open trunk did not convert the dog sniff into a search. U.S. v. Lyons, 486 F.3d 367, 374 (8th Cir. 2007)(holding the canine's act of sticking his head through a car window left open by the defendant was not a search in violation of the Fourth Amendment).

"The warrantless search of a vehicle is constitutional pursuant to the 'automobile exception' to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began." U.S. v. Castaneda, 438 F.3d 891, 893 (8th Cir. 2006)(quoting U.S. v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)). Probable cause to search a vehicle exists when there is a "fair probability that contraband or evidence of a crime will be found" in that vehicle. U.S. v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007).

> Determining whether probable cause exists at the time of the search is a "commonsense, practical question" to be judged from the "totality-of-the-circumstances." Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause . . . does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime."

Donnelly, 475 F.3d at 954(quoting U.S. v. Mounts, 248 F.3d 712, 715 (7th Cir. 2001)).

A dog's "alert" or "indication" of drugs in a car, standing alone, provides probable cause for a warrantless search of a vehicle. Donnelly, 475 F.3d at 955; U.S. v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994). In contrast, a dog's "interest" in a particular object or place may add to the probable cause analysis

but, absent a positive "alert" or "indication," does not establish probable cause. U.S. v. Jacobs, 986 F.2d 1231 (8th Cir. 1993)(holding that a warrant application stating that a dog had shown an interest in the defendant's package but omitting that the dog failed to alert to the package, when reviewed and corrected as required under Franks v. Delaware, 438 U.S. 154, 171 (1978), did not set forth sufficient facts to support probable cause).

During a canine sniff, the dog's role is to determine if the scent of illegal drugs is present and, if so, to respond in a manner that conveys that information to the canine handler. Canines may have idiosyncratic ways of "alerting" or "indicating" the presence of the odor of illegal drugs. U.S. v. Trayer, 898 F.2d 805, 808 (D.C. Cir. 1990). The role of the officer as canine handler is to interpret the dog's behavior and communicate the dog's message.

> [T]he dog and handler function as an integral team. The dog is the sensor, and the handler is the trainer and interpreter. The handler's performance in both roles is inseparably intertwined with the dog's overall reliability rate. . . . Each dog develops an individual pattern for communicating an alert, which must be interpreted by the handler, or another familiar with that dog. Otherwise, for example, a reaction to the odor of food, or another animal, might be mistaken for an "alert" to drug odors. . . . . [T]he informant is the dog, not the handler. The handler merely interprets the dog's actions.

U. S. v. Paulson, 2 M.J. 326, 330 (A.F.C.M.R. 1976). See also, U.S. v. Outlaw, 134 F. Supp. 2d 807, 813 (W.D. Tex. 2001)("In some instances, an alert is simply an interpretation of a change in the dog's behavior by a human handler.").

Deputy Sheriff Brown is Alec's canine handler.  He was not asked, and provided no testimony explaining what he noticed Alec do that communicated to him that Alec smelled illegal drugs.  He did not testify that Alec "alerted" or "indicated" to the odor of drugs, or even that he showed any specific "interest" in the defendants' vehicle due to the scent of illegal drugs.  The vague statement that Alec exhibited "significant behavior changes" is insufficient to establish probable cause.

Moreover, even assuming a court could review a recording and determine for itself that a canine "alerted" or "indicated" to the scent of illegal drugs, I cannot make that determination based on the video recording in evidence.  Having thoroughly reviewed the recording of the traffic stop, and Deputy Sheriff Brown's description of the "indication" as stated on that recording, I do not see any "objectively observable 'indication' by the dog of the presence of drugs." U.S. v. Heir, 107 F. Supp. 2d 1088, 1091 (D. Neb. 2000).  Alec appears to be a very energetic dog, and he was obviously quite agitated during this traffic stop.  As such, I cannot tell if he jumped into the Camry trunk because he simply wanted to, because he was trained to, or because he smelled something, and if he smelled something, I do not know what he smelled.  There is no testimony explaining how this dog acts when distracted or how he responds to smells other than the scent of illegal drugs.  See e.g., U.S. v. Kelly  128 F. Supp. 2d 1021, 1026 (S.D. Tex. 2001) ("Canines may exhibit behaviors consistent with an alert as a natural response to many odors associated with innocent activities."); U. S. v. Thomas  1 M.J. 397, 402 (C.M.A. 1976) ("What effect an open locker had on [the dog's] behavior is not clear from the record.  For all the record suggests, her response to the accused's open locker might

have been due to her lack of obedience training rather than to
her marihuana detection training.").

Deputy Sheriff Brown's in-car recording describes Alec's
head jerks as signals that he smelled illegal drugs.  Although I
can see the dog sniffing around in or near the trunk, there is no
visible evidence of the dog's head jerking as described by the
officer on tape.  It may be present but unrecognized due to lack
of information or context on how this dog normally acts.
However, the court cannot make the finding that a dog "alerted"
or "indicated" to the scent of illegal drugs based solely on an
officer's taped, roadside explanation where the facts described
on the tape cannot be seen and discerned on the recording absent
the officer's testimonial explanation.

There is insufficient evidence to support a finding that
Alec "alerted" or "indicated" to the scent of illegal drugs in
the defendants' vehicle.  Based on the evidence before the court,
Deputy Sheriff Brown lacked probable cause to search based on the
canine sniff alone.

Even in the absence of an "alert" or "indication," a
canine's "interest" in a vehicle or location can be considered as
part of the totality of circumstances in assessing the existence
of probable cause.  Jacobs, 986 F.2d at 1235.  See also, U.S. v.
Guzman, 75 F.3d 1090, 1096 (6th Cir. 1996)(holding officer's
awareness of the dog's interest in the defendant's bag may be
considered in determining whether the totality of the
circumstances established probable cause).  However, as
previously explained, the evidence does not support a finding
that Alec's "significant behavior changes" were due to a specific
interest in the defendants' vehicle, and even if they were, what

peaked that interest.  As such, the canine sniff adds nothing to
the probable cause assessment.  U.S. v. Rivas, 157 F.3d 364, 368
(5th Cir. 1998) (holding dog's act of temporarily stopping with
his attention deterred, and then continuing on with his
examination ("casting"), was not an "alert," and absent testimony
from the dog handler explaining the meaning of the dog's
behavior, the government failed to show that dog's "casting"
created reasonable suspicion to support a border search).


     Based on the evidence presented at the evidentiary hearing,
Deputy Sheriff Brown lacked probable cause to search the
defendants' vehicle.  The search of the vehicle occupied by the
defendants, and the detention of the defendants while that search
was conducted, violated the Fourth Amendment.  The defendants'
motions to suppress the evidence derived from that search should
be granted.



     IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard
G. Kopf, United States District Judge, that defendants' motions
to suppress, filings 24 and 27, be granted.

     The parties are notified that a failure to object to this
recommendation in accordance with the local rules of practice may
be held to be a waiver of any right to appeal the district
judge's adoption of this recommendation.


     DATED this 22nd day of May, 2008.


                         BY THE COURT:

                         s/ David L. Piester
                         David L. Piester
                         United States Magistrate Judge



                              23